Okay, good afternoon. I'm going to call the next case. I see counsel here. Case number 1-18-1768, by the hand versus Department of Employment Security. My name is David Ellis. I'm the presiding justice of the Third Division. I'm joined on the panel today by Justice Margaret McBride and Justice Cynthia Cobbs. We are once again conducting an oral argument via Zoom. Could I ask for an introduction from counsel for the department? This is Janet Fabiano. I'm here on behalf of the plaintiff appellant. Okay, Ms. Fabiano, we don't have you on video, is that? I'm not sure why that is. Okay, well, you know, if this is what you can do, I certainly don't have any objection to you proceeding. Does anybody else have an objection? Okay, great, we have you now. And for by the hand? Jeremiah Gallus for by the hand. Okay, Mr. Gallus, good afternoon. Sorry that we kept you waiting. We were supposed to be saying good morning to you and now it's good afternoon. So because we are doing this via Zoom, it's been our experience, at least in this division, that when people are talking at the same time on Zoom, nobody can hear anything that's said. And so what we have opted to do is to give each side 10 minutes of uninterrupted presentation. For the appellant, which I believe is the department, you can reserve whatever time for rebuttal. Neither side is under any obligation to use all of your 10 minutes. We always appreciate brevity. And after each attorney argues their presentation uninterrupted, the justices will be identified and recognized individually for questions. That's about the best we can do to maintain some order. Does everybody understand that, how that's going to work? Yeah. Oh, okay, I'm getting it. You do. Great. And so we will first hear from the department. And that's Miss Fabiano. Would you like to reserve time for rebuttal? Yes, I would. I'd like to reserve five minutes for rebuttal. Okay, then we'll give you five minutes starting right now. Excuse me. We have a total of 10 minutes. 10 minutes of uninterrupted and then we'll ask questions for as long as it takes. So I'm sure you will be answering questions. I'm sure you're going to be presenting more than 10 minutes, but we're just going to give you some time to do uninterrupted presentation if you wish. Okay. May it please the court. I'm Janet Fabiano. I'm an assistant attorney general here on behalf of the defendant appellants. The issue in this case is whether the board's decision that the plaintiff was not exempt from the Illinois Unemployment Insurance Program under the statutory exemption for certain religious related organizations was not clearly erroneous. And reaching its decision, the board determined that the plaintiff was not operated primarily for religious purposes within the meaning of this statute, where although it engaged in some religious activities, its main activities were to provide homework help, reading assistance, meals, and access to medical services, which activities had objectively secular purposes. This court should affirm the board's determination and reverse the circuit court's judgment because the decision was amply supported by the evidence in this case and was consistent with this court's decision, providing that organizations that are primarily engaged in secular activities are not operated primarily for religious purposes, although their motive for providing such services may be religious. Recognizing the risks of harm due to involuntary unemployment, the Illinois Unemployment Insurance Act was enacted to alleviate these perils by providing economic relief to those who become involuntarily unemployed. Therefore, it is intended to be liberally construed in favor of coverage and any party claiming that it is exempt from the act's statutory standard for the exemption. In addition, exemptions are strictly construed. Thus, the plaintiff here has the burden of proving that it met the statutory standard for the religious-related exemption. And not only did it have the burden of proof, but the board's decision is entitled to deference. The department is the agency charged with administering the act, and therefore it has the experience and expertise in enforcing its determinations as to whether an employer has established that it falls within an exemption from the act's coverage must be upheld unless it is clearly erroneous. Whether an employer is entitled to an exemption as a religious-related organization is governed by section 211.3a of the act, which provides that employment for purposes of the act does not require that an organization, among other requirements, is operated primarily for religious purposes. And in determining the purposes for which an organization is operated, the courts look to the activities that it is engaged in, and in assessing those activities, looks to the purpose to which the activities are directed and not the motive for performing them. Of course, as a threshold matter, the organization must believe that its activities have a religious purpose, but its intentions alone, while necessary, are not sufficient. Rather, whether activities are religious under the statute is then determined by the objective function of the activity. Thus, this court has found that an organization that primarily provides secular services is not operated primarily for religious purposes, even if those services are offered for religious reasons. For example, in St. Augustine, the court had held that a community center providing services to Native American families was not operated primarily for religious purposes, although it was affiliated with the Episcopal Church, offered religious services on site, and stated that its purpose was to help Native American families achieve a better life, both morally, spiritually, and physically. And in Concordia, the court had held that a cemetery established by several Lutheran churches for members of the Lutheran faith were not operated primarily for religious purposes, although the church considered burial to be part of its religious services because burying the dead is a secular function. And here, the facts of this case amply support the board's determination that the plaintiff's primary activities were secular. The evidence showed that it was an after-school program for children in the Chicago Public School, and that for most of its locations, it ran four days a week, starting at around 3.30 to 4, and running until 6.30. And out of the 10 to 12 hours per week spent in the program, the children spent only two and a half to three hours attending a Bible study or chapel, and the remainder of their time attending academic rotations and being fed. For example, on Monday, Tuesday, and Wednesday, the children spent 30 minutes attending Bible study or chapel services, and the rest of their time having a meal and attending three academic rotations, which consisted of one rotation for doing homework with someone there to help if necessary, then one rotation for a computerized reading program, and one rotation for reading aloud, where a staff member would select material to read. The program for Thursdays was a little different. The children still had dinner, but then spent 30 minutes on homework, and then an hour to an hour and a half on their Bible study or chapel. So, the evidence also showed that in addition to the academic programs, the plaintiff also provided the children access to medical care, getting them examined if needed, and sending them to the eye doctor or dentist. In addition, its staff would meet with the children's teachers at their schools to discuss their reading needs. Therefore, the facts of this case amply support the board's determination that the plaintiff's activities were not primarily religious. While some of its activities had a religious purpose, the children spend a majority of their time in activities that objectively have a secular purpose, such as doing As a result, the board's decision was not clearly erroneous, and we should have been upheld for these reasons. We would ask that the court reverse the judgment of the circuit court and reinstate the board's decision. Thank you, counsel. So, we will recognize Justice McBride for any questions. Thank you. Would you agree that the decision of the board has to be based on the evidence that's presented? Yes. Would you also agree that this particular after-school program was free? Yes. Everything was free. And would you also agree that all of the employees were actually mandated to be of the Christian faith? There were certain requirements for them to be involved in the process. Is that true? Yes. And the after-school program participants were, you know, young children up to high school, but they were also mandated to participate in religious class participation every single day that they were there. Well, I mean, they did attend those, yes, those classes. Is there anything in the record that would suggest that they weren't mandated to participate in Bible study? No. Was there any testimony from anyone that would suggest that the giving of food and providing tutoring service, and, you know, everything was actually without any cost, including the health, that this was not a, could be akin to charitable work? Excuse me? Wouldn't you say that everything was free? Yes. I mean, there are after-school programs where you have to pay to participate, right? Correct. Okay. And all of the faculty or participants, you know, had to actually profess their faith, and they couldn't be, you know, anyway involved in this program unless they were going to be actively engaged in proselytizing to the children. Well, the Evans just simply said, I mean, they have to be able to lead Bible studies. They were required to do that. Sure, but there were other requirements, too. They had to agree that they were church-going people. But in any event, is it up to the board to decide whether, you know, the provision of all these things was something other than charity and that charity can also be synonymous with a religious purpose? Well, it's not whether or not charity could be synonymous with a religious purpose. The question here is, is there a religious purpose here within the meaning of the statute? And what the courts have looked at is they look at the objective function of the activities that are being performed there and not the motivations for performing them. And here, they were primarily providing academic program assistance, assistance with their academics, meals, and access to medical services. And these activities, the function of these activities is secular. Well, is it secular when they're being provided for free? Yes. Well, certainly. I mean, yes. I mean, it's the, again, it is the activity itself, the objective function of the activity that you're looking at. And here, the function of these activities is to help them with their homework, to give them a meal, to provide access with health care, and to provide, you know, reading assistance. Sure, but wasn't one of the purposes of this was to provide this religious thought to everything they were doing, mind, body, and spirit? But that, I mean, that's not what's determinative of whether or not they are, whether or not they are primarily operated for a religious purpose within the meaning of the statute. You know, like in the St. Augustine case, again, they were providing social services to these families, although they stated, you know, that the reason was to help them achieve a better life spiritually, and morally, and physically. And they were providing religious services on site, but the court found that it still was not operated primarily for. In the St. Augustine case, there was no requirement that anyone that worked there had to be Christian. There was no requirement at all that any of the participants had to attend Bible studies every single day. So I don't know how you can compare that case, but where was the testimony that the board relied on to come to this conclusion? What testimony? It was all the testimony with regards to the activities that they were engaged in. They, you know, explained that the program consisted of like 10 to 12 hours per week, and on three of those days, it would spend only 30 minutes of the two and a half to three hours there on chapel, or a Bible study. And the remainder of that time, they were involved in academic rotations and having a meal. And because these types of activities are objectively secular, they, the board determined that they were being operated primarily, they weren't operated primarily for religious purposes. But no one actually said that. That was a decision that the board made based upon its review of the testimony, even though all of the witnesses said that everything they did was basically for a religious purpose. Again, yeah, the, what constitutes a religious purpose is not, is the objective function of the activities and not the motivations for performing that. So would you say there's a significant dichotomy then between all of these Christian schools and parochial schools that are all considered functioning in a religious purpose, even though they all teach secular subjects? Well, in Illinois, I don't know of, you know, cases that are holding that other than, you know, the Unity Christian case. Well, that's the only case really that delved into a school. The cemetery cases, would you really think that they have anything to do with this decision? I mean, there was no one there that had to be a Christian working at the cemetery, even though they were owned by a particular faith. And you had to be a member of that faith or their family to be buried there, and they considered burial part of their, you know, religious services. But it's not unlike the cases in the property tax appeal board too, where they had provided, where they're in the faith builders, where they had a daycare center, where they were providing religious instruction to the children. And their purpose was for purposes of evangelizing and teaching them, you know, religion. And they found that that was not operated primarily for religious purposes, because the primary activity was child care, which is not a religious purpose. Was that free? The child care there provided free? No. No. And you don't think that this $8 million that they spend in their annual budget, I mean, you're sort of divorcing the whole idea that charity can be part of religion, aren't you? No, I mean, well, while charity can be part of religion, the issue here is whether or not this is a religious purpose under this statute. But who makes that decision? And on the evidence, not something that the board decides to, they don't even discuss, do they, in their decision, the fact that these services, providing food, tutoring, and the education and the health, that all of this is provided free to those that are, you know, willing to participate? But again, the issue is the activities that they are engaged in. And that's what determines whether or not they are operated primarily for religious purposes here. And again, the activities that they are primarily engaged in were the, you know, the providing of the reading assistance, the providing of a meal, the providing of health care services, which all had objectively secular purposes. All right. I don't have any other questions. I'm sorry, Justice Cox, please. Yes. Oh, excuse me. Thank you. Ms. Fabiano, is there any evidence in the record with respect to how the student participants are recruited to participate in this program? It says that the staff meet with schools who might recommend students that need reading assistance. And so that's how they get in touch with them. In the recruitment effort, is the inducement or the enticement ever for, I don't want to use the word proselytizing, I don't know what word to use, is the recruitment, based on the evidence in the record, ever to offer to build up religious or Christian beliefs? Or is there any talk about enhancement or increasing faith as a part of the inducement for the students to participate? There's no evidence of that. In fact, I mean, the children are not required to be of any faith to participate in the program. And that it does give priority to children who do have reading deficiency. So the program, the after school program, all of the activities are offered free to the children. Is there an exemption in the act for charity? No, I mean, non-profit charitable organizations are covered under the statutes. Has the board ever made a distinction or is there a case that distinguishes charity from religion or that defines either or both? Well, no. But again, under the statute, the non-profit organizations are, I mean, the statute specifically says that they are covered by this statute. And then it carves out a narrow exemption for organizations that meet the statutory standard of being operated primarily for religious purposes. Is there any case that you can cite that defines primarily? I think that's the operative term. I understand related to, I understand offers in addition to, is there anything that you can cite to that a case that defines operating primarily, primarily operating for? Other just than saying that it would be a matter of the first import. So I imagine that there are lots of charitable programs that offer a full range of activities. And if it's a program that operates without cost to the participants, perhaps like by the hand, all of the services, all of the benefits are offered free. Is there ever a time where a program can operate primarily for religious purposes and also offer what might be perceived to be secular activities? What would that case look like? Well, I mean, the issue would be whether or not they are predominantly or primarily operated for religious purposes. So you would just look at all of the activities that they are providing and look to the objective function of those activities itself and not the purpose for providing the activity. I have nothing further. Okay. Thank you very much, counsel. My questions have been covered as well. And so I will turn to Mr. Gallus if we have Mr. Gallus. Mr. Gallus, you don't need to use 10 minutes if you wish. Thank you, Your Honor. May it please the court. Jeremiah Gallus on behalf of By the Hand Club for Kids. The circuit court was right to reverse the department's revocation of By the Hand's longstanding religious exemption for two main reasons. First, the record shows that By the Hand's primary purpose is the same as it has always been, to lead children by the hand to the abundant and eternal life that comes through a personal relationship with Jesus Christ. Second, the specific activities that the department relies on to reclassify By the Hand as secular are in fact an exercise of By the Hand's religion. Providing free food, free education, and free medical care to needy children supports the conclusion that By the Hand is operated primarily for religious purposes. By concluding otherwise, the department wrongly rejected By the Hand's good faith characterization of its religious beliefs and substituted its own of religion, a view so narrow that it could be used to withhold a religious exemption from any religious organization that ministers to the poor and needy. In fact, under the department's view, even Mother Teresa's ministry could be labeled secular because it feeds the hungry and because it provides medical treatment to the poor. That cannot be. Turning first to my friend on the other side's statement that the department's decision here is entitled to deference. While it is true that clearly erroneous standard applies here, in the AFM messenger case, Illinois Supreme Court has made clear that courts need not blindly defer to an agency's determination. And if, like the circuit court, it is left with a definite and firm conviction that a mistake has been made, it is proper to overturn. And that's exactly what we have here when looking at the record as properly construed. Evidence of By the Hand's religious purpose absolutely saturates the record. It is found not only in By the Hand's articles of incorporation, bylaws, and other governing documents, but it is also present in By the Hand's daily operation and activity. In other words, By the Hand's religious intent, its religious and founding, matches up with its religious activity. In looking to its religious purpose and founding, we should start really with the founding itself, which is a ministry of the Moody Church. And Danita Travis, the executive director and founder of By the Hand, testified in an affidavit, which can be found at page 758 and 759 of the record, that she felt called by God to start this ministry to minister to under-resourced children in the Chicago inner-city neighborhoods. This purpose, this religious purpose, continues to this day and can be found all throughout the record. For example, in the employee handbook, found at page 894 of the record, it states that By the Hand students are mentored spiritually with a goal of each child developing a personal and saving relationship with Jesus Christ. That's why By the Hand measures success by whether students have accepted and professed faith in Jesus Christ and whether they go to church. Justice Cobb asked a question about how the program is marketed. And By the Hand markets this in its annual reports, its emails, its e-signs, they call them, to its donors and those who are supporters of the ministry and who might want to send their children to the ministry. It sets forth in there the professions of faith. It monitors that. It sets forth the numbers of children who are coming to a relationship with Jesus Christ, the number of children who are now going to a faith-based church. That is a religious activity. That's a religious purpose. The entire ministry was founded on a scripture verse, John 10.10. And that talks about Jesus coming and giving life and life abundantly. And the testimony from By the Hand was that, in By the Hand's view, abundant life encompasses the entire child, holistic, body, mind, and soul. So it's an exercise of its religious faith. And if you look at the activities that are just set forth in the record, By the Hand has a statement of religious doctrine and belief. It has Bible studies and chapel services on a daily basis. Children are required to attend. It hands out Bibles and the gospel presentation the very first day of programming. It sets aside time for staff to pray with the children and their family. It has an evangelism curriculum that it uses so that it ensures that children are being taught about Jesus and what a relationship with him looks like. It has being Christ-like as a core value. They hire spiritual development specialists at each of their locations to ensure that this religious purpose is remaining consistent throughout all the locations. And as Justice McBride noted, they have hiring requirements where every employee must be a Christian, attend a Bible-believing church, follow a Christian code of conduct, and be willing to lead children in prayer, Bible study, and chapel services. Those are hallmarks of a religious organization, not a secular one. Secular after-school programs do none of those things. The only way the department reached a different conclusion was to determine that By the Hand's provision of free food, free education, and free medical care are in fact strictly secular and can never be religious. But as I indicated at the outset of my presentation here, those activities are in fact compelled by By the Hand's religious beliefs. By the Hand believes that the abundant life that Jesus came to provide as referenced in John 10.10 means caring for the whole child, and that means taking care of physical needs, mental needs, and spiritual needs. By the Hand's good faith characterization of those activities is entitled to deference. The department didn't provide it any deference, and that's a violation of the First Amendment. The United States Supreme Court has said time and time again that a secular court or standard should define what is and is not religious. And I just point this court to the Cathedral Academy case, which we referenced in our brief, which I think encapsulates this idea well. And what the U.S. Supreme Court says there was the prospect of church and state litigating in court about what does or does not have religious meaning touches the very core of the constitutional guarantee against religious establishment. Yet that's precisely what we're doing here today, litigating over whether providing free food, free medical care, and free education to needy children is in fact religious or secular. That's why the good faith deference rule is in place. That's why in Calvary Baptist, the court said that in looking at whether an activity is religious, the court should be limited to two inquiries. First, does the entity assert that its activity is religious? And second, is that assertion bona fide? There's no question here that by the hands assertion of those activities of being religious and exercise of its religious faith is in fact bona fide. And this good faith deference rule isn't just rooted in constitutional principles. It's rooted in common sense and practical ones as well. As the circuit court recognized in overturning the department's conclusion, it said that context matters, context is important. So you cannot determine what one's purpose is or an activity's purpose without understanding the why behind it. And just a few examples to illustrate the point. Bible reading, for instance. People can read the Bible for a variety of reasons. They can read the Bible to learn about history. They can read the Bible to learn about different literary forms. They could read the Bible just to practice their reading. But when they're reading the Bible to learn about God and to learn about what he says about how one should conduct his life, that becomes a religious activity. The same with drinking wine or eating bread. That can be a nice snack for some or it can be Holy Communion or a sacrament for others, depending on why they're doing it. The same with singing. One can sing Amazing Grace or God Bless America and it could be an entirely secular activity. But if they're doing it as a song of praise or a song of prayer, it's now a religious activity. And so the good faith deference rule recognizes that context matters in determining the purpose of an activity. And in fact, the statute uses that term purpose. And so for the state to contend that motivation or intent doesn't matter in determining what the purpose is, that's just belied, I think, by the common definition of the term and also common sense. And just one last point, which I touched on. The department's approach, if accepted and there are of course limits on how far the government can go. And at the heart of this case is who gets to decide whether an activity is or is not religious. In the department's unilateral determination, which they've set forth no criteria, no guidelines by which they're determining providing free food and free medical care and free education are always secular activities. There's no guidelines on which they go by. That places a burden on religious organizations, religious beliefs, in violation of the free exercise clause of the federal constitution, state constitution, as well as the Illinois Religious Freedom Restoration Act. And in the Amos case, the United States Supreme Court said that forcing a religious organization to predict which of its activities a secular court or agency will consider religious would impose a significant burden and might affect the way an organization carried out what it understood to be its religious mission. So in other words, what the department is doing here is putting by the hand to a choice. It can give up its religious activities. It can give up its beliefs that it feels as though to care for the whole child, they need to provide free medical care, free education, and free food, or it loses its exemption. That's precisely the burden those constitutional provisions in state statute are designed to avoid. I'm happy to take any questions. Thank you very much. We'll turn to Justice McBride who is on mute. There we go. Justice McBride. I don't have any questions. Justice Cox. Justice Cox. Just trying to unmute here. Yes, thank you, Mr. Gallus. Can you address the Supreme Court's decision in Provena and its discussion with respect to the good faith characterization? It seems to go a little differently from the way you describe it. Seems like the court in Provena wanted or at least suggested that if left the good faith characterization, if we stop at the inquiry there, we don't have the judiciary's engagement or involvement in making any determination, but it rests solely and entirely with the entity that seeks the religious exemption. Can you address Provena? Yes, and I see that as well, Your Honor, but I do think there's a distinction, a couple of distinctions that can be made to help understand how Provena fits in with this case. The first is recognizing that Provena was a property tax case, not an exemption case under the Unemployment Act. So under the property tax exemption, the courts are asked to look at the actual use of the property versus here, the whole emphasis is on the purpose. And so the intent, I'd say matters, is put more up front in this context than as a property tax case. There's also a couple of factual differences with Provena than in this case that I think are important. The first is that the Illinois Supreme Court noted in Provena that the hospitals there were providing medical services for a fee. And so that's not what we And in addition to that, the Illinois Supreme Court noted that the hospitals there were not making any claim that providing services for a fee were somehow necessary or part of its religious exercise. So there's a couple of distinctions there. And if I understand Your Honor's question, and maybe the reasons it's being asked, and certainly some of the concerns the state seems to be raising in its brief, is the question of, okay, well, where's the limit? How do we define where the boundaries are? And there's two real limiting principles here that I think this court should be aware of in making a decision. The first is found in the statute itself. The second is found in the case law like Provena Covenant and some of the other cases that were referenced here today. So the first, an entity, a religious ministry or organization is not eligible for this exemption under the Unemployment Act, unless it is also operated, controlled, supervised, or principally supported by a church or association of churches. So that really limits the field as to who's even eligible for this. And of course here, by the hand, is controlled by the Moody Church. So the concern that just anybody can start any business and say, hey, I'm doing this for religious reasons, and therefore they avail themselves to the convention, that's just not supported by the plain text of the statute. The other limiting principle comes from the case law. And this is in Provena, although that's a property tax case. But if we look at the cemetery cases, which are under the Unemployment Act, in all of those cases, they talk about the commercial and business-like nature of the organization. And so you have situations there where the commercial transactions that were taking place overcame whatever religious intent or religious purpose may have been there from the alcove. It would turn into a commercial endeavor. The Franciscan Communities case, I think, is a good example. There was a retirement village that was started by an order of nuns, but they were marketing that retirement village, selling property there for hundreds of thousands of dollars. And the court there said, you're selling care to the giving care to needy children. It's not selling it. And that's a distinguishing, I think, an important distinguishing fact. Can you address, Mr. Gallus, why By the Hand is separately incorporated as opposed to being a part of Moody? Why is it incorporated separately, if you know? Well, there was some testimony about that at the hearing, so it is in the record. By the Hand was founded in 2001 under the Moody Church. In 2005, it's separately incorporated. And the explanation given for that was it was separately incorporated for liability purposes. Of course, when you have an after-school program with hundreds of children, there's certain liabilities that could be there that otherwise wouldn't pay. And the second reason was it allowed for donation and soliciting of donations a little bit easier. And you could understand why. If someone wants to give specifically to By the Hand in support that ministry, they want to make sure that the money goes specifically to By the Hand and not necessarily the other activities of the church. It's easier to solicit funds that way. But the Act allows for separate incorporation. It's very clear that separate incorporation, while that puts them under a different test, separately incorporated entities that are church-controlled, as By the Hand is, can still be entitled to the religious exemption, so long as they're operated primarily for religious purposes, which the record amply supports here. I understand the liability issue, but to avoid any question with respect to primarily operated for religious purposes, wouldn't it have been a cleaner way to organize if this were simply an entity operating under Moody? I mean, we kind of muddy the water when we set them apart from Moody, and Moody contributes somewhat. They have a hand in, what, $100,000 toward $8 million in funding. And you may not be able to answer this either, but it just seems to me to be cleaner and clearer that we're operating for religious purposes if we're a church. And again, I still grapple with, is there an organization that can do both that would fit within the parameters of operating primarily for religious purposes? Well, I think under the department's view, if you accept their view of religion, it essentially eviscerates subsection A2. The types of activities that they're willing to consider as religious consist of things that really only churches do, religious worship, religious instruction. But the statute, to answer your question, Your Honor, would it have been cleaner? Yes, it would have been cleaner because under A1, which is if you're an entity under the church, you're not separately incorporated, you're automatically entitled to the exemption. The court doesn't even look at whether it's operated for primarily religious purposes. So you could have a church doing the same thing with an afterschool program, and they get the exemption. The separate incorporation just says, okay, if you're going to separately incorporate, we're going to look a little closer to see if you are in fact operated primarily for religious purposes, which when you look closer here, that's exactly what By the Hand is doing. Nothing's changed. If you look at its activities from 2001, when it was initially founded under the Moody Church, to what it's doing here today, it's the same thing. The activities are exactly the same. The mission, the goal, the purpose has always been the same. I think that highlights the subjective nature of the department's test or standard that they're applying is that nothing's changed in the law, nothing's changed in By the Hand's activities or operations, but yet all of a sudden the department comes in and says what you're doing is no longer religious, it's secular. That's the only reason that's true in the department's view is because there's been presumably a change in staff there. We saw that from the ALJ or the ALJ. That's when he said, well, that's when things were run a little differently around here. The statutory exemption cannot depend on the whims of government officials. I would agree with that. Now, you made a comment that made me think about the 2008 and 2009 letters, but when you read those letters, they actually indicate that the source of the salaries were from a church, but that's not true, is it? That's not accurate, is it? That's true. I would agree, Your Honor, that the analysis there was lacking, but the point is nothing's changed in By the Hand's activities or purpose from day one. But you would agree we can't rely on those letters to support a conclusion that your operations are primarily religious now? I would agree, yes. I would point you to the record that's been in this case, which shows that By the Hand is operated primarily for religious purposes. And then I'm going to have one more question, and then I'm going to let it go. In the Articles of Incorporation or the bylaws, there's language in there that says By the Hand is organized exclusively for religion and charitable purposes, not one or the other, not primarily one or the other, and not that the two concepts are even conflated. It appears to me that there is a difference between the two, and I'm clear that there is 501c3 status, which requires the charitable, and probably the religious could get you there, but not necessarily one or the other. How do you square that? It's exclusively organized for both, not primarily for one or the other? Well, I would square in saying that acts of charity are essential and have been for millennia, for all sorts of faith groups, Christians included, that they're not mutually exclusive, they can be both. And that's where I point this court to the effects of the department's view on that, is that you would look at Mother Teresa's ministry and say, well, what are you doing? Oh, you're providing free food. Oh, you're providing free medical care. You're educating children. That seems secular to me. And that ignores reality, the fact that religious people do acts of charity as an exercise of their religious faith, not just that they're motivated to do it by faith, but the act itself is a religious act. Thank you. Thank you, Mr. Gallus. Okay, thank you very much, counsel. I don't have any questions beyond what's been asked, so Ms. Fabiano, we're a little tight on time, but we'll give you a couple minutes for rebuttal. Okay. Again, whether an organization is operated primarily for religious purposes, the courts have looked to the activities that they are engaged in, and they have repeatedly stated that their intentions are not what control. You have to look at the activities. And while they haven't provided an all-inclusive definition of what constitutes religious purposes under the Act, they have not provided a definition of the types of activities that would be similar to religious instruction or public worship. Therefore, in some of the property tax cases, they had found that a home run for the elderly, a nursing home, was not operated primarily for the elderly, and that that was a tenet of their faith, because the activities were predominantly providing housing and care for the elderly, which is a secular activity. And again, with the child support cases, they had stated that although their goal was to educate the children with child support, providing child care is still a secular activity. They are saying that the board failed to accept their characterization of their religious beliefs, and this is really misunderstanding both the cases that have addressed this and the board's decision in court. The court also said that this does not mean that they must accept their characterization of the actual use of property, and that the courts must still look to the property to determine whether it is being used for religious purposes as that term is understood under the statute. And here, the board did accept their characterization of the religious beliefs, but then simply determined that the objective function of the activities was secular. And this determination was supported by the record. Again, the record did demonstrate that the predominant functions that they were doing was to provide reading instruction, homework, health, to provide meals, and to provide access to medical services. And these have an objectively secular purpose. And as a result, the board's decision should be affirmed. So we would ask that the court reverse the circuit court's judgment and reinstate the board's decision. All right, counsel. Thank you very much. We're running out of time here. Do the Thank you, Mr. Gallus. Thank you, Ms. Fabiano. Your briefs were outstanding. Your presentation today was as well. We appreciate it. We're going to take the matter under advisement, and we're going to stand adjourned. Thank you.